## BLOIS *v.* THE STATE.

Corroboration of an accomplice upon the facts and circumstances of the *corpus delicti*, when these facts and circumstances have no more tendency to fix guilt upon the accused than upon any other person, will not dispense with corroboration of that part of the testimony of the accomplice which goes to identify the accused as the perpetrator or one of the perpetrators of the crime. In the present case all the facts and circumstances (taken separately or collectively), relied upon as corroboration, were consistent with innocence on the part of the accused, and were therefore insufficient to satisfy the rule of law which requires the evidence of a single witness who is himself an accomplice to be corroborated, and forbids conviction on a charge of felony upon the evidence of an accomplice alone.                    *Judgment reversed.*

May 2, 1893.

Indictment for murder. Before Judge FALLIGANT. Chatham superior court. March term, 1893.

On the night of Sunday, January 24, 1892, A. W. Meyer was murdered in his soda water factory in Savannah. An indictment for the murder was found against Williams, Gay, Bacon, Heyward, and Joe Blois. The defendants severed. Blois was convicted, and his motion for a new trial was overruled. He was in Meyer's service, and lived with him in the factory. No one else lived there. It was situated on Duffy street, the en-

trance on that street being but a short distance from West Broad street. About eight o'clock on the fatal evening, Meyer went to the house of Garwes, remained there more than an hour, and left with the declared purpose of going home. About half an hour after he left, and at some time past ten o'clock, Garwes (whose house was on West Broad and Henry streets, Henry being the next street to Duffy) was called from his house and notified of the murder by Dr. Sheftall, who had been summoned from his home by Lubs, who had been called by Blois. Garwes testified, that he asked Blois where he found Meyer, " and he took three steps that way and said he found him lying there and he ran for Mr. Lubs. He said he was in the building when he saw him. He did not tell me how he got in. When the chief of police came he asked him how he found him first, and he said he went and peeped through a crack in the door. ' I saw Mr. Meyer lying on the floor; I thought he was drunk, and I ran for Mr. Lubs,'—Joe said that. That was the statement he made in my presence. . . Killoughry made him go outside and show him how he did it." Garwes further testified, that when Meyer started to go home, witness asked him what he was in a hurry for, and he said he did not have the key to get in his place. " Mr. Meyer always did have a key. If he did not have his key, I suppose he waited for the boy that fed his horses. They fed their horses usually about ten o'clock. This boy Joe Blois fed the horses. Mr. Meyer told me he did not have the key. I suppose he left so as to meet Joe. I understood he was going to meet him at the stable. . . I saw Mr. Meyer's keys lying alongside of him. I knew they were his keys, because I knew his stable keys. They had turned him over then. They were lying about that far from his pocket after they had turned him over. I am sure they are Mr. Meyer's keys. I saw them several times.

I don't know whether they were Joe Blois's keys. I won't say they were. They were the keys of the factory. I won't say who carried them. I can't say that I ever saw Mr. Meyer with those keys, but I have seen him with the keys to the factory. There was one key on the bunch, but there was something on there to keep from losing that one key. It looked more white than anything else."

Lubs testified, that about ten o'clock Blois came to his house and said Meyer was lying in the factory on his face, and he did not know what was the matter with him,—to come there and see. " I went there with Blois, and he handed me the key, and it was so dark I could not find the keyhole and handed the key back to him, and he opened the door. He did not say anything in going to the place. I was walking very fast. He said that Mr. Meyer was lying there on his face; that that was nothing new for him. I found Mr. Meyer lying on his face, and . . I went right off for Dr. Sheftall. Dr. Sheftall and myself and Joe Blois turned him over. His pockets were turned inside out. Joe Blois had been working in the soda water factory since 1890. I was the first one that hired him in 1890. I had charge of the factory. . . . Meyer was not a drinking man very much. I never knew him to be drunk. I thought, if he was lying on his face, that he was sick. I did not take the key from Joe and unlock the door. There was a light inside. The first thing I saw when I got to the factory was Mr. Meyer lying on his face in the corner (about twenty-five feet from the door at which I entered). I found the keys by his side. This one was not on it, but the other two were on it. There was nothing on that bunch of keys that looked white. I don't know whether they are the ones Mr. Garwes saw. They were lying on his right side, not more than six inches. He generally carried a bunch of keys. I have

seen him with these keys on his person. I recognize
them as his keys. He may have had them in his pocket,
and when they were turned wrong side out they might
have reached that position. . . . Joe Blois always had
the keys. He had a key just like that. He had just
one stable key. . . He had to feed the horses that
night. He had the key to that door to the stable. . .
He had the key to the door on this side of the lane.
That other large door, there was no way to get in it
from the outside. Joe had a key of his own. Nobody
else to my knowledge, except Mr. Meyer and Joe Blois,
had a key to that place.

Dr. Sheftall testified, that he was called by Lubs
about fifteen or twenty minutes after ten o'clock. His
gate was on Duffy street, ten or fifteen feet from the
factory. He went immediately and found that Meyer
was dead; the body was still warm; his throat (jugular
vein) had been cut, and the blood was still oozing from
the wound. Upon his head were four fractures, two in
front and two at the back, also a contused wound, any
of which could have produced unconsciousness. He
was lying in a pool of blood which had not coagulated.
The weather was cold, and it takes a shorter time for
blood to coagulate in cold weather. The witness thought
the deed must have been done about ten or fifteen min-
utes before he was summoned, and that the wounds on
the head were given first and the throat cut afterwards.
The head wounds were made with some blunt instru-
ment, and could have been made with a soda water
bottle.

Bacon, the accomplice, testified that he saw Meyer at
the time he was killed, and that Blois, Williams, Hey-
ward, Gay and Lewis did it. There was a light in the
house, and Bacon (who had been left outside to watch
while the others robbed) saw what occurred, by standing
on a pile of bricks on the ground under a window and

looking through the window. Blois opened the door for
Meyer to get in. After he got in, Gay knocked him
down with an axe-handle, Williams held him, Blois hit
him with a soda water bottle, and Heyward cut him in
the neck with a knife. Lewis was standing in the door.
—This witness, in the course of his testimony made
numerous contradictory statements, but adhered sub-
stantially to the foregoing recital. He manifested con-
siderable ignorance in several particulars; and some of
his statements as to time of occurrences, location of
objects about the building, etc., do not seem to agree
with the testimony of other witnesses. He testified that
Blois told him he had Meyer's keys.

O'Connor testified, that he saw Blois shortly after eight
o'clock on the same evening, with two other colored
men not recognized, at the corner of West Broad and
Bolton streets, two blocks from Duffy street. They were
engaged in conversation none of which the witness dis-
tinguished, except he heard Blois say he was going to
feed his stock. Blois was tying his shoe. Witness
spoke to him, and he answered. One of the three was
about the size of Williams.—Brittle testified, that about
seven o'clock on the same evening he saw Gay and Wil-
liams and a third man not recognized. He first passed
Gay, and after going one block farther, came upon the
other two at the corner of West Broad and Henry streets,
opposite Garwes's place. These two were talking, and
they stopped talking when witness came up. Williams
looked at witness; the other man turned his back. Wit-
ness went to his home and went to sleep. At some time
past eleven o'clock, he awaked and heard two men walk-
ing and talking on the street. They made his blood-
hound dash against the fence, and he heard them remark,
" You will be the next one we will do." They passed by
his room, whispering, one trying to talk faster than the
other; and they went in the direction of Williams' and

Gay's house. Heyward also lived right there, their yards all being in one. This was three or four hundred yards back of Brittle's house. He thought he recognized the voices of the men who passed his house, as those of Williams and Gay; he was pretty familiar with their voices. The unknown man he saw with Williams on West Broad street was too stout to be Heyward. He thought Blois was fuller or thicker through the body than Heyward.

It further appeared, that on the next day after the murder, Meyer's watch, and two axe-helves with blood on them, were found in the house occupied by Gay. Meyer had a habit of carrying a large amount of money on his person, and was not particular when anybody was around to keep them from knowing it. Blois was placed under arrest on the night of the murder, was released the next morning, and rearrested that afternoon. No evidence in his behalf was introduced at the trial. In his statement he claimed that he knew nothing of the killing and was not guilty. After giving his account of what transpired during the day and early in the evening in question, he stated: "I went home, changed my clothes and ate my supper. I went out and met two friends. I stooped down to fix my shoe, and Mr. O'Connor passed and I spoke to him, and he went on down Bolton street and I remained there with those two. I went on down and did not stop over five minutes. I stopped on the corner of Gwinnett and West Broad, and then went on down to Simms street. I went home, and at the time I got to the factory I ran my hand in my pocket and opened the door, and I went up to where Mr. Meyer was and stood over him a minute, and I said, I must let Mr. Lubs know; this is something serious for him. I told Mr. Lubs, and he asked me how I could see it, and I told him I had the key. He said he did not open the door; he did open the door; of

course he ain't going to say that; it don't make any difference whether I opened the door or not. That shows I am not guilty of anything," etc. The State's counsel said he wished to ask a question of defendant, who had the right to answer it or not; and asked, if as soon as he found Mr. Meyer he went at once and reported the same to Mr. Lubs. Defendant answered, yes. In rebuttal, the State introduced Amy Wallace, who testified that she lived in Duffy street about forty or fifty yards from Meyer's factory. She was at church at half past nine o'clock that Sunday night. About ten minutes after she got home, Blois came to her house and told her that he started in the factory to feed his horse, and Mr. Meyer was lying down; and that he was going around to Mr. Lubs to tell him about it. She told him that was right. He said Mr. Meyer was lying down. He did not know what was the matter. Said he was going in to feed his horses, and that is the way he saw him.— Killoughry, assistant chief of police, testified, that he reached the place about twenty-five minutes of twelve o'clock, called Blos aside and had a talk with him. "He said there that he saw a light in the store, and he peeped through the keyhole or crack in the door. I tried to get something out of him. He told me that he went and notified Mr. Lubs. Some time afterward he made another statement, that he opened the door and saw Mr. Meyer lying on the floor. I asked him why he did not go near him, and he said he was afraid. As soon as I got him by the body I thought he had a hand in it, because he shuddered and turned away. . . . . He wanted, the morning after the arrest, to make a statement; and he tried to connect a mulatto man that lived in Whitaker street, stating that he was not on the best of terms, and that he was seen round there in the street the night previous. He tried to make out that there had been some intimacy between Mr. Meyer and this

man's wife. . . I examined him carefully. He told
me that he peeped through a crack in the door and saw
a light in there; and never a time he said he opened the
door and saw the body."

JACOB GAZAN and LIVINGSTON KENAN, for plaintiff in
error.   J. M. TERRELL, attorney-general, and W. W.
FRASER, solicitor-general, contra.